UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | |
| v. | Case No. 08-cr-30126-JPG |
| HERIBERTO TORRES-RODRIGUEZ, | |
| Defendant. | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on defendant Heriberto Torres-Rodriguez's motion to suppress statements he made in a May 23, 2008, post-arrest interview (Doc. 30). The government has responded to the motion (Doc. 37), and Torres-Rodriguez has replied to that response (Doc. 49). The Court held a hearing on the motion on April 27, 2009. At that hearing, the following witnesses testified for the government: Opa-Locka, Florida, Police Officer Michael Steel; FBI Special Agent James Lewis; FBI Special Agent Rosa Schureck; and FBI Special Agent Patrick Henson. The defendant presented no witnesses.

Torres-Rodriguez is charged in this case with two counts of traveling in interstate commerce with the intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b) and one count of transporting a minor in interstate commerce with the intent to engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a). His pending motion to suppress (Doc. 30) seeks to exclude oral and written statements he made to law enforcement agents on May 23, 2008, on three theories: (1) his waiver of his *Miranda* rights was involuntary, (2) his statements were involuntary and (3) his statements were made during a period of unreasonable and unnecessary delay in presenting him to a judge.

**I.    Facts**

With the exception specifically noted in footnote 1, the Court found the witnesses to be credible based on their demeanor while testifying, the foundations they had for testifying to certain facts and the consistency of each witness's testimony with other evidence in the case. The evidence at the hearing established the following uncontroverted facts.

On Tuesday, May 20, 2008, the Belleville, Illinois, Police Department received a report that a minor female ("Jane Doe") was missing. On Thursday, May 22, Special Agent Lewis, who worked in the Miami FBI field office, learned from a Belleville FBI agent through informal channels that there was reason to believe the missing child may be in the Miami area. Special Agent Lewis then reached out to local law enforcement, formed a "game plan" and began searching for Jane Doe. They were unsuccessful, and Special Agent Lewis stopped working on the case for the day around 12:30 a.m. on Friday, May 24.[1]

At approximately 2 a.m. on Friday, May 24, Opa-Locka Police Officer Steel received a call from his local dispatcher that Jane Doe, the subject of an "AMBER alert," was believed to be at a house at 601 Jann Avenue in Opa-Locka and that she might be suicidal. The Opa-Locka dispatcher had been notified of the AMBER alert by the Seminole County, Florida, Sheriff's Department. Officer Steel and other Opa-Locka police officers approached the house quietly and saw Jane Doe in the backyard of the house. Officer Steel knocked on the front door, and Torres-Rodriguez answered the door. When it became apparent to Officer Steel that Torres-Rodriguez

---

[1] Special Agent Lewis testified that he has substantial experience with interstate child abduction cases but that, when he first learned of the child missing from Belleville, he did not know whether the events involved in this case would constitute a federal crime. The Court does not find this testimony credible. With Special Agent Lewis's extensive experience in federal interstate child abduction cases, it was clear that he knew at the time that federal charges were possible and likely.

was not proficient in English, Officer Steel called Officer Leal, a Spanish-speaking officer, to translate. When Torres-Rodriguez identified himself with the name disseminated in the AMBER alert as the suspected abductor, Officer Steel handcuffed him behind his back and placed him in the back of his squad car. He remained there while local law enforcement officers searched the house. Torres-Rodriguez had been awake since 6 a.m. on the morning of Thursday, May 22.

At approximately 2:30 a.m., Officer Steel drove Torres-Rodriguez to the Opa-Locka police station. Officer Steel parked the car in a garage area that was closed off from outside view because he was concerned that media might show up on the scene. Officer Steel kept Torres-Rodriguez in the back seat of the car because there was no holding cell in the police station. Officers monitored Torres-Rodriguez at all times, and Officer Steel offered Torres-Rodriguez water and the opportunity to use the bathroom.[2] Torres-Rodriguez appeared calm and quiet. At some point while Torres-Rodriguez was in the back of the car, Officer Leal informed him of his *Miranda* rights in Spanish. In the meantime, the Opa-Locka Police Department was communicating with the Belleville Police Department regarding drafting the paperwork necessary to hold Torres-Rodriguez in confinement for kidnaping in violation of Illinois state law. At 4:19 a.m., the Belleville Police Department faxed Officer Steel a letter indicating it was working with the FBI on the case and that an FBI agent would be contacting Officer Steel.

At approximately 5 a.m., Officer Steel drove Torres-Rodriguez to the Miami/Dade County Police Department facility where he could be booked ("warrants facility"). On the way to the warrants facility, Torres-Rodriguez was calm, and when they arrived, he was immediately removed from the car and booked. At the warrants facility, Officer Steel again asked him

---

[2]Although Officer Steel was not proficient in Spanish, he was able to communicate basic concepts such as an offer of a drink or water or of the use of a bathroom.

whether he wanted to use the restroom. At no time did Torres-Rodriguez complain of pain from the handcuffs.

At approximately 5:30 a.m., Officer Steel drove Torres-Rodriguez from the warrants facility to Miami/Dade County Corrections ("the jail"). When they arrived at the sally port of the jail around 5:40 a.m., Officer Steel received a phone call from an FBI agent informing him that federal agents would be getting involved in the case. This was his first contact with federal law enforcement authorities. Torres-Rodriguez was then placed in an outdoor holding facility with a concrete floor, a fan and a tarp covering to shield detainees from the sun. Although the holding facility had a capacity of about 50 detainees, Torres-Rodriguez was the only detainee in at the time. Torres-Rodriguez remained in this cell for approximately two hours because the jail was on lock-down and he could not be processed to an indoor holding cell. Sometime between 7:40 a.m. and 8:50 a.m., Torres-Rodriguez was processed into the jail. At that time he was offered food, water and the opportunity to make a phone call. Torres-Rodriguez had remained handcuffed since his arrest at 601 Jann Avenue and did not sleep.

In the meantime, Special Agent Lewis learned at 6 a.m. on Friday, May 23, that Jane Doe had been located. He got this information through the FBI's media representative and was upset that local law enforcement had not contacted him immediately upon Torres-Rodriguez's arrest. He began to assemble a team of law enforcement officers consisting of himself, Spanish-speaking Special Agent Schureck and Florida Department of Law Enforcement Special Agent Edward Royal, to interview Torres-Rodriguez.

The interview began at approximately 10 a.m. Torres-Rodriguez was not handcuffed during the interview and was even-tempered, calm, cordial and well-mannered. He was not offered food, but was asked if he wanted water or to use the bathroom. Special Agent Schureck

4

read Torres-Rodriguez his *Miranda* rights in Spanish from a form and he indicated he understood and waived them. The interviewers did not use threats or physical force when interviewing Torres-Rodriguez, and he appeared willing to answer questions. Torres-Rodriguez then gave an oral self-incriminating statement and consented to a search of his residence, truck and van. Toward the end of the interview, the law enforcement officers took a break to prepare a written statement. Torres-Rodriguez was groggy at the time due to lack of sleep, so he asked Special Agent Schureck to write the statement for him. While she prepared a written statement based on the oral interview, Torres-Rodriguez took a nap. When she was finished, Torres-Rodriguez woke up and signed the statement. The interview then concluded around 2:45 p.m. At no point did any law enforcement officers attempt to arrange to have Torres-Rodriguez brought before a magistrate judge.

Also around 9 or 10 a.m. on Friday, May 23, Special Agent Henson met with an Assistant United States Attorney in the Southern District of Illinois, who then opened a formal investigation. That afternoon, Special Agent Lewis contacted the United States Attorney's Office in Florida regarding filing federal charges against Torres-Rodriguez. After 4 p.m., it was decided that the United States Attorney's Office in the Southern District of Illinois would file the charges instead. A criminal complaint was filed in this district on that day.

Torres-Rodriguez argues that his self-incriminating statements and his waiver of his *Miranda* rights were involuntary because he was exhausted, in pain, hungry and thirsty when he gave the statements and waived his rights. He also argues that he gave his statement during a period of unnecessary and unreasonable delay in presenting him to a magistrate.

## II. Waiver of *Miranda* Rights

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal

case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966), the Supreme Court determined that the rule against self-incrimination attaches, and is "fully applicable during a period of custodial interrogation." Consequently, law enforcement officers must comply with certain "prophylactic" procedures before questioning an individual in custody. "[T]hey must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda* at 468-70); *accord Dickerson v. United States*, 530 U.S. 428, 435 (2000). The *Miranda* requirements are constitutional, not simply an exercise of the Supreme Court's supervisory authority to regulate evidence. *Dickerson*, 530 U.S. at 438, 444.

A defendant may waive his rights to remain silent and to have counsel present during interrogation. However, a waiver must be voluntary, and once a defendant makes a *prima facie* showing that his waiver was involuntary, the government has the burden of showing by a preponderance of the evidence, considering the totality of the circumstances, that a defendant knowingly, intelligently and intentionally waived these rights. *Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986). In *Moran v. Burbine*, 475 U.S. 412 (1986), the Supreme Court set out a two-part test to determine the voluntariness of the waiver:

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421 (citations omitted). Accordingly, to determine if a waiver was

voluntary, courts should consider factors such as the "defendant's background and conduct, the duration and conditions of detention, the mental and physical condition of the defendant, the attitude of the police, and whether the police utilized psychological or physical coercion." *United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Coercion by law enforcement officers is required before a waiver will be found to have been invalid. *Connelly*, 479 U.S. at 163-64; *Moran*, 475 U.S. at 422.

The totality of the circumstances show that Torres-Rodriguez voluntarily relinquished his *Miranda* rights with a full awareness of the nature of those rights and the consequences of his decision to waive them. Torres-Rodriguez was a mature adult with the mental capacity to communicate clearly with Spanish-speaking law enforcement officers in a calm manner. Although he was tired when the interviewers obtained his waiver, his detention at that point had not been excessively long (eight hours in less than comfortable but not deplorable conditions, six or seven of which were attributable to the complicated booking process used by the Opa-Locka Police Department), and he had been offered water and the opportunity to use the bathroom on multiple occasions and food at least once. The circumstances of the arrest, the booking procedure and the interview were civil and revealed no hint of coercion or other improper police behavior, and Torres-Rodriguez showed no sign of excessive discomfort. He was advised of his rights in Spanish, a language he understood, confirmed that he understood those rights and subsequently waived them in a waiver written in Spanish. Considering the totality of the circumstances, his waiver was the product of a free and deliberate choice rather than intimidation, coercion or deception and was done with full knowledge of his rights and the consequences of waiving them. Thus, his statements are not subject to suppression on the basis

7

that he did not voluntarily waive his *Miranda* rights.

## III.     Self-incriminating Statements

Torres-Rodriguez also argues that his confession must be suppressed because it was not voluntary. Due process guarantees have been interpreted to require suppression of a confession if it was not voluntary. A statement is subject to suppression on due process grounds if it was involuntary:

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). "A confession is involuntary when it was given in circumstances that were sufficient to overbear the confessor's free will." *Johnson v. Pollard*, 559 F.3d 746, 753, (7th Cir. 2009) (citing *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)). On the other hand, "[a] confession is voluntary if, in the totality of the circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (internal quotations omitted). Coercive law enforcement activity is necessary to warrant suppression on the grounds that a defendant's confession was involuntary. *United States v. Montgomery*, 555 F.3d 623, 632 (7th Cir. 2009) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)), *pet. for cert. filed*, No. 08-9746 (April 3, 2009).

The Court considers the totality of the circumstances in determining whether a confession was voluntary. *Montgomery*, 555 F.3d at 631-32. The totality of the circumstances includes

8

"the characteristics of the accused and the details of the interrogation. . . [including] the youth of the accused, . . . his lack of education, . . . his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep. . . ." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (internal citations omitted); *accord Montgomery*, 555 F.3d at 632.

For the same reasons the Court found Torres-Rodriguez's waiver of his *Miranda* rights was voluntary, it finds that his will was not overborne and that his capacity for self-determination was not critically impaired prior to or during the interview in which he made his self-incriminating statements. Consequently, his statements are not subject to suppression on the grounds that they were involuntary.

## IV. Presentment

Torres-Rodriguez argues that his statements must be suppressed because he made them during an unnecessary delay in presenting him to a magistrate judge. Federal Rule of Criminal Procedure 5(a)(1)(A) provides that an arresting officer must "take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer . . . unless a statute provides otherwise." "[A]n arrested person's confession is inadmissible if given after an unreasonable delay in bringing him before a judge." *Corley v. United States*, 129 S. Ct. 1558, 1562 (2009) (citing *McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449, 455-56 (1957)); *Upshaw v. United States*, 335 U.S. 410, 413 (1948). "The prompt-appearance requirement serves to protect the defendant's rights and to interpose a check on law enforcement zeal by ensuring the timely intervention of a judicial officer who can

9

confirm that the defendant has been advised of his rights, that he has been detained on probable cause, and so on." *United States v. Mansoori*, 304 F.3d 635, 662 (7th Cir. 2002). This principle is commonly called the *McNabb-Mallory* rule. In *Mallory*, the Supreme Court made clear that delay due to the desire to interrogate a suspect or to extract a confession constitutes "unnecessary delay":

> The police may not arrest upon mere suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.
>
> The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession.

*Mallory*, 354 U.S. at 454-55.

The *McNabb-Mallory* rule is only applicable to defendants arrested or detained for violations of federal law unless there was a "working arrangement" between federal officials and the state officials holding the detainee. *See Anderson v. United States*, 318 U.S. 350, 356 (1943); *see United States v. Carter*, 910 F.2d 1524, 1528 (7th Cir. 1990); *United States v. Gaines*, 555 F.2d 618, 622 (7th Cir. 1977). In *Anderson,* a county sheriff arrested individuals and detained them for days while federal agents extensively interrogated them. *Anderson*, 318 U.S. at 353. Only after they confessed were they arrested on federal charges and later arraigned before a federal magistrate judge. *Id.* at 356. The Supreme Court found that because there was a working

arrangement between the federal officers and the sheriff in which they collaborated to bypass the presentment requirement, the confessions had to be suppressed. *Id.* Federal officials simply cannot conspire to bypass Rule 5(a)(1)(A)'s presentment requirement by allowing state officials to detain suspects for them on state charges. Where such a "working arrangement" is alleged, the defendant has the burden of showing that the state involvement was used to circumvent Rule 5(a)(1)(A). *Carter*, 910 F.2d at 1528; *Gaines*, 555 F.2d at 625.

In ruling on a motion to suppress based on the *McNabb-Mallory* rule, the Court must determine whether there was any unnecessary or unreasonable delay *at the time the confession was made*; subsequent illegal detention does not retroactively change the circumstances under which the suspect made his confession. *Upshaw*, 335 U.S. at 413 (citing *United States v. Mitchell*, 322 U.S. 65, 70 (1944)). This is because, if a self-incriminating statement is otherwise admissible, subsequent wrongful detention cannot be said to have *produced* the confession. *Mitchell*, 322 U.S. at 70.

Congress qualified the *McNabb-Mallory* rule when it created a six-hour "safe harbor" in 18 U.S.C. § 3501(c), which provides:

> In any criminal prosecution by the United States . . . , a confession . . . given by a . . . defendant . . ., while such person was under arrest . . . , shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . .if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made . . . within six hours immediately following his arrest or other detention . . . .

18 U.S.C. § 3501(c); *Corley*, 129 S. Ct. at 1564; *see Mansoori*, 304 F.3d at 660. "[T]he six-hour clock begins to run for purposes of section 3501(c) when the individual is arrested or otherwise detained for a violation of federal law, not when he is taken into federal custody."

11

*Mansoori*, 304 F.3d at 661.

In *Corley*, the Supreme Court described how a suppression claim under the *McNabb-Mallory* rule should be addressed in light of § 3501(c):

> [A] district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate]"). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and . . . the weight to be given [it] is left to the jury." . . . If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed.

*Corley*, 129 S. Ct. at 1571.

Answering the first *Corley* question – whether the defendant confessed within six hours of arrest – is more complicated than it appears at first blush. It is clear that the interview in which Torres-Rodriguez gave his self-incriminating statements commenced approximately eight hours after he was arrested. However, his initial arrest was by local authorities for kidnapping in violation of Illinois state law. There was at that time no federal involvement, no federal charge and no "working arrangement" to bypass the presentment requirement. Thus, until a "working arrangement" like that in *Anderson* developed, federal officers cannot be said to have violated any presentment obligation. It is true that on Thursday, May 22, FBI agents began assisting in the search for the missing girl and discussed a "game plan" with local Florida law enforcement officers. However, it was the Opa-Locka Police Department in cooperation with the Belleville Police Department, neither of which is a federal agency and neither of which was pursuing federal charges, that arrested Torres-Rodriguez at 2 a.m. on Friday, May 23. They did not develop anything that could be characterized as a "working arrangement" with federal authorities

12

– the FBI – regarding potential federal charges until, at the earliest, those authorities contacted Officer Steel by phone at 5:40 a.m. on Friday, May 23, and informed him they would be getting involved in what Special Agent Lewis knew was likely a federal case. The Court finds that that 5:40 a.m. phone call began the "working arrangement" between Torres-Rodriguez's keepers and the federal government and triggered the presentment requirement of Rule 5(a)(1)(A).

Torres-Rodriguez's interview began within six hours of the commencement of the "working arrangement," and so falls within the "safe harbor" of 18 U.S.C. § 3501(c). To the extent the interview extended beyond the six-hour "safe harbor," the Court believes it is reasonable to delay presentment to a magistrate in order to continue an interview of a cooperating suspect begun within the safe harbor period so long as the interview is not unreasonable in length or conditions. Here, the initial interview was continuous until approximately two to three hours after the safe harbor period expired, and Torres-Rodriguez was cooperative and forthcoming during essentially all of the interview. Until the interviewers took a break to reduce his confession to writing, it was reasonable to delay presenting Torres-Rodriguez to a magistrate judge.

During the break, however, it was unnecessary to delay presenting Torres-Rodriguez to a judge any longer. The break was toward the end of the interview and was clearly beyond the six-hour "safe harbor" period. If the break was sufficient to allow the defendant to take a nap, it was certainly sufficient to arrange to have him taken before a magistrate judge. For this reason, the Court will suppress the statements, including Torres-Rodriguez's written statement, given after the break in the interview.

This ruling is consistent with the purposes of the exclusionary rule to encourage

compliance with Rule 5(a)(1)(A)'s presentment requirement.  No evidence suggests wrongdoing on the part of federal officials before or during the collection of the oral statements that exclusion would deter.  Furthermore, no evidence suggests the delays caused by the arcane booking procedure in Miami/Dade County would be discouraged by suppression or were somehow attributable to federal collusion.

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** defendant Torres-Rodriguez's motion to suppress (Doc. 30).  The motion is **GRANTED** to the extent it seeks to suppress Torres-Rodriguez's written statement and oral statements occurring after the break in the interview on the afternoon of Friday, May 23, 2008.  The motion is **DENIED** to the extent it seeks to suppress any other evidence.

**IT IS SO ORDERED.**
**DATED:  May 14, 2009**

                                              s/ J. Phil Gilbert
                                              **J. PHIL GILBERT**
                                              **UNITED STATES DISTRICT JUDGE**